**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
ASHBY HENDERSON and THOMAS     )
HERSHENSON, Individually and on)
Behalf of All Others Similarly )
Situated,                      )
                               )
              Plaintiffs,      )          Civil Action
                               )          No. 15-10599-PBS
v.                             )
                               )
THE BANK OF NEW YORK MELLON, N.A., )
                               )
              Defendant.       )
_____)
```

**MEMORANDUM AND ORDER**

September 14, 2018

Saris, C.J.

**INTRODUCTION**

This proposed class action claims that Bank of New York
Mellon, N.A. ("BNY Mellon"), breached its fiduciary duty to its
trust beneficiaries by charging excessive and undisclosed fees
for the preparation of the trusts' tax returns. The plaintiffs
have moved for certification of a class, and both parties have
moved for summary judgment. After a hearing, the Court **ALLOWS IN
PART** and **DENIES IN PART** the motion for class certification (Dkt.
No. 285). BNY Mellon's motion for summary judgment (Dkt. No.
315) is **ALLOWED IN PART** and **DENIED IN PART**, as detailed below.

The plaintiffs' motion for partial summary judgment (Dkt. No. 365) is **DENIED**.

**FACTUAL BACKGROUND**

The following facts are drawn from the class-certification and summary judgment record. They are undisputed except where stated.

## I.   **The Parties**

Plaintiffs Ashby Henderson and Thomas Hershenson both seek to represent the proposed class. Henderson is a beneficiary of the Walter H. Wesson Trust ("Wesson Trust"), a trust created under Massachusetts law. Hershenson is a beneficiary of T/D of Morris A. Hershenson Trust f/b/o Lee M. Hershenson ("Hershenson Trust"), a trust created under Pennsylvania law.[1] Both trusts are irrevocable trusts. The trustee of both trusts is BNY Mellon.[2] BNY Mellon administers thousands of trusts, with tens of thousands of trust beneficiaries.

## II.   **BNY Mellon's Tax-Preparation Services**

Since 2007, BNY Mellon has contracted with PricewaterhouseCoopers ("PwC") to prepare and file tax returns

---

[1]   The Hershenson Trust is now in its winding-up phase, having terminated with the death of Dr. Lee Hershenson in November 2015. The winding-up is subsumed in a legal proceeding in Allegheny County, Pennsylvania.

[2]   The Second Amended Complaint also named BNY Mellon Corp. (the parent company of BNY Mellon, N.A.) as a defendant, but the plaintiffs voluntarily dismissed their claims against that entity.

for most, if not all, BNY Mellon trusts. Since 2008, PwC has
prepared the tax returns for both of the trusts at issue here.
Prior to the arrangement with PwC, BNY Mellon prepared fiduciary
tax returns through its in-house tax department. Two aspects of
the PwC arrangement are hotly contested.

First, the parties dispute the scope of PwC's work. The
plaintiffs assert that BNY Mellon "completely" outsourced tax-
preparation services to PwC. BNY Mellon asserts that it retained
responsibility for performing a variety of ancillary functions
necessary to the actual filing of the tax returns -- such as
setting internal tax policy, reviewing PwC's work, and
reconciling accounting systems with PwC's records.

Second, the parties dispute whether PwC was paid on a per-
trust or aggregate basis. The plaintiffs point to language in
the relevant BNY Mellon-PwC contracts that appears to break out
tax-preparation fees on a "per account" basis. BNY Mellon points
to deposition testimony from its own personnel and PwC officials
indicating that the parties negotiated a total aggregate fee
based on anticipated volume, and that the per-account figures
indicated in the contract documents were calculated after the
fact to facilitate a true-up between the parties.

## III. __BNY Mellon's Evolving Fee Structures__

Until 2012, BNY Mellon used approximately 1,500 different
fee schedules for its trust customers; that number has been

pared to around 100 in more recent years. At least three
pertinent to this case were in effect at different time periods:
(1) a discrete line-item fee for tax-preparation services; (2) a
bundled "fiduciary fee" covering tax preparation and other
services; and (3) a bundled "advisory fee" covering numerous
services, including tax-preparation work.

From 2008 to 2012, BNY Mellon used the line-item tax-
preparation fee. During this era, the bank generally charged
tax-preparation fees of $400 for grantor trusts, $750 for
revocable trusts, and between $750 and $950 for irrevocable
trusts, depending on complexity. "Simple" irrevocable trusts
paid an annual line-item fee of $750. The Wesson Trust was one
such trust. "Complex" irrevocable trusts paid a line-item fee of
$950. The Hershenson Trust was in this category.

Notwithstanding these general categories, what a particular
trust paid for tax-preparation services could vary from trust to
trust and from year to year. For instance, some trusts paid tax-
preparation fees as low as $25 per year or had the fees waived.
Others paid more than $1,000 per year for tax-preparation
services.

In 2010, Dr. Lee Hershenson (the plaintiff Hershenson's
father) raised questions about his tax fee, along with other
fees, to his wealth manager at BNY Mellon. As a result, the
Hershenson Trust was converted to a "service fee" of 2 percent

of market value per year on its first $500,000, and 1.75 percent on the next $500,000 -- with no line-item fee for taxes. It is not clear on this record whether other trusts had similar arrangements, or whether this agreement was unique to the Hershenson Trust. In any event, since 2010, the Hershenson Trust has not been charged a line-item tax-preparation fee.

Starting in 2012, BNY Mellon changed its fee structure with respect to tax-preparation fees for most trusts. In 2012, the bank shifted those trusts that were still charged a line-item tax-preparation fee to a structure that imposed a bundled "fiduciary fee" and no tax-preparation line-item fee. This shift applied to the Wesson Trust, but not the Hershenson Trust, which remained on the "service fee" schedule described above. Since 2012, the Wesson Trust has not paid a line-item tax-preparation fee. The parties point to nothing in the record indicating how much the "fiduciary fee" was or what it included.

In late 2013 and into 2014, BNY Mellon changed its fee structures again, moving trusts, on a rolling basis, to a schedule based on "advisory fees." It is not clear on this record whether or to what extent the "advisory fees" resembled the "fiduciary fees" just discussed. In any event, in 2014, the bank moved both the Wesson and Hershenson Trusts to the AD-75 fee schedule, which is an "advisory fee" schedule. Under this structure, the "advisory fee" covers numerous "front- and back-

office services," including asset allocation, account
administration, portfolio monitoring, performance reporting --
and, of course, tax preparation. The "advisory fee" typically
ranges from 0.75 percent per year on a trust's first $3 million
down to 0.20 percent on anything over $25 million.

## IV.   <u>Fee Disclosure</u>

In 2007, shortly after BNY Mellon hired PwC, the bank
crafted a letter to alert customers to the change. It stated:
"Reflective of the service, the tax preparation fee will be $400
for grantor trusts, $750 for revocable trusts, and between $750
and $950 for irrevocable trusts, depending on complexity." The
parties dispute to whom, if anyone, this letter was sent.

In 2012, when the bank shifted to a "fiduciary fee," many
customers received a letter stating that the new fee "replaces"
the former "base fee" and "tax preparation fee." However, the
parties point to nothing in the record explaining in more detail
what the "fiduciary fee" covered or how much it cost for
customers.

Starting in 2013 and into 2014, BNY Mellon began alerting
customers to its new "advisory fee" system via another letter.
This letter described the new system as "a new, more
straightforward way of determining fees," but the letter did not
include any detail on what specific services the fee covered. A
separate fee schedule discloses the amount of the fee and what

it covers, but it is not clear to whom, if anyone, this fee
schedule was provided.

V.    **Procedural History**

In February 2015, Henderson filed the original complaint,
which raised class action claims that the defendant breached its
fiduciary duty when it made imprudent investments of trust
assets into affiliated funds. In March 2016, Henderson filed the
First Amended Complaint, which added the class claims relating
to the tax-preparation fees. After some procedural skirmishing,
a Second Amended Complaint ("SAC") was filed in November 2016,
adding Hershenson as a named plaintiff with respect to the tax-
preparation claims. The SAC is the operative complaint.

In late 2017 and early 2018, the parties attempted to
settle the case. However, in February 2018, Henderson on her own
sent the Court a letter objecting to her own attorneys' proposed
settlement. She later withdrew that objection. After a hearing
on the proposed settlement, the Court found Henderson's
objections compelling and rejected the settlement.

Henderson has since moved to withdraw her individual and
class claims alleging the imprudent investment of trust funds so
that she may pursue them in a separate case in Pittsburgh. After
an ex parte hearing just with Henderson (but not her warring
attorneys) in August 2018 to assess the voluntariness of her
decision, the Court dismissed those claims without prejudice.

Because of this withdrawal, only Counts IV and V of the SAC remain; both pertain solely to the tax-preparation theory. Count IV asserts a breach of fiduciary duty claim, and Count V seeks an accounting.

Both Henderson and Hershenson seek to represent the following class to pursue those claims:

> The Unlawful Fees Class: From 2008 to the present, all personal trusts: (1) for which BNY Mellon served or serves as trustee, and charged a "tax preparation fee" or "fiduciary" fee for one or more of the covered years, and (2) the paid preparer of the fiduciary return covered by the "tax preparation fee" or "fiduciary" fee was PricewaterhouseCoopers for one or more of the covered years.

The motions for class certification and summary judgment are fully joined. The Court held separate hearings on each.

## DISCUSSION

### I.   **Class Certification**

#### A.   **Legal Standards**

A class may be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to these four prerequisites, the class must also satisfy at least one requirement of Rule

23(b). Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38

(1st Cir. 2003).

Here, the plaintiffs invoke Rule 23(b)(3), which requires

the Court to find "that the questions of law or fact common to

class members predominate over any questions affecting only

individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b). The considerations relevant

to these findings include:

> (A) the class members' interests in individually
>     controlling the prosecution or defense of
>     separate actions;
>
> (B) the extent and nature of any litigation
>     concerning the controversy already begun by or
>     against class members;
>
> (C) the desirability or undesirability of
>     concentrating the litigation of the claims in the
>     particular forum; and
>
> (D) the likely difficulties in managing a class
>     action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Finally, the First Circuit adds an extra-textual

ascertainability requirement to the class certification

analysis. "[T]he definition of the class must be 'definite,'

that is, the standards must allow the class members to be

ascertainable." In re Nexium Antitrust Litig., 777 F.3d 9, 19

(1st Cir. 2015); Matamoros v. Starbucks Corp., 699 F.3d 129, 139

(1st Cir. 2012) (holding that a class was not "unascertainable and overbroad" where it was defined in terms of an "objective criterion").

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23] -- that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011) (emphasis in original). Certification is proper only if the Court is satisfied, "after a rigorous analysis," that the Rule 23 prerequisites have been satisfied. <u>See</u> <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 161 (1982).

**B.  Analysis**

BNY Mellon contests certification of the proposed class on the grounds of commonality, typicality, predominance, superiority, and adequacy.[3] The plaintiffs argue that they have satisfied all of the Rule 23 requirements.

---

[3]     Although BNY Mellon does not contest numerosity, it is met here, as the plaintiffs proffer that there are approximately 15,000 covered trusts under the class definition -- a figure BNY Mellon does not dispute. <u>See</u> <u>George v. Nat'l Water Main Cleaning Co.</u>, 286 F.R.D. 168, 173 (D. Mass. 2012) (noting that a proposed class of 40 or more generally meets numerosity in the First Circuit).

Similarly, BNY Mellon is correct not to dispute the class's ascertainability. That criterion is met because membership in the class is defined by reference to the imposition of a "tax preparation fee," a definite and objective standard. <u>See</u> <u>In re Nexium</u>, 777 F.3d at 19.

### 1.   *Commonality*

Rule 23(a) requires that the proposed class share a common
question of law or fact. Fed. R. Civ. P. 23(a)(2). "Rule 23(a)'s
requirement of commonality is a low bar, and courts have
generally given it a 'permissive application.'" In re New Motor
Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 19 (1st
Cir. 2008). Commonality demands only the existence of a "single
issue common to all members of the class." Natchitoches Parish
Hosp. Service Dist. v. Tyco Int'l., Ltd., 247 F.R.D. 253, 264
(D. Mass. 2008) (emphasis in original).

BNY Mellon argues that the plaintiffs have failed to show
that answering common questions will resolve their dispute. The
bank states that the tax fees, and disclosures of those fees,
varied from trust to trust and from year to year, and that these
differences defeat commonality.

With respect to the varying fees, record evidence confirms
BNY Mellon's contention that different trusts paid different
tax-related fees, and that these fees changed over time. In
particular, the bank points to evidence that it has used as many
as 1,500 trust fee schedules. However, it does not assert that
those schedules resulted in 1,500 different tax-preparation
fees. To the contrary, the record suggests that during the
pertinent period, BNY Mellon generally imposed tax-preparation
fees of $400 for grantor trusts, $750 for revocable trusts, and

between $750 and $950 for irrevocable trusts, depending on complexity.

With respect to disclosure, the record contains a 2007 notice that describes, in general terms, that the bank contracted with PwC for tax-preparation services. But the bank has not pointed to any evidence that it expressly told any donor or beneficiary of the tax-fee markup being challenged in this case. The bank also argues that PwC's phone number was listed on certain tax forms sent to beneficiaries. But PwC's act of preparing a trust's tax returns is not the behavior at issue here; it is BNY Mellon allegedly overcharging the trusts for PwC's services.

Thus, notwithstanding the issues identified by the bank, several common questions of law and fact unite the proposed class:

- Did BNY Mellon charge trusts more than PwC charged it for tax preparation?

- If such a markup existed, did it violate BNY Mellon's fiduciary duties?

- To what extent did BNY Mellon disclose the costs of tax preparation fees and the amounts charged by PwC?

- Was that disclosure sufficient to fulfill BNY Mellon's fiduciary duties and/or to provide the proposed class members sufficient notice such that they ratified the fees by failing to contest them?

- If there was a breach of fiduciary duty, what is the proper remedy and how are damages calculated?

Although the bank posits that those questions may yield different answers depending on the individual circumstances of particular trusts, it has not pointed to any specific evidence to support that assertion. Thus, the Court is satisfied that the plaintiffs meet the commonality requirement. See New Motor Vehicles, 522 F.3d at 19 (discussing "low bar" of commonality).

That said, the bank is correct that these questions become more difficult to answer once BNY Mellon started bundling the tax fees into other fees (circa 2010 for the Hershenson Trust, and circa 2012 for other trusts, including the Wesson Trust). The Court addresses those concerns below, under the rubric of summary judgment.

### 2.  Typicality

Typicality requires that the class representative's "injuries arise from the same events or course of conduct as do the injuries of the class," but his claims need not be "identical to those of absent class members." In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008). The touchstone is "whether the putative class representative can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns." Id. (quoting Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 264 (D. Mass 2005)).

BNY Mellon argues that the plaintiffs' claims will require numerous fact-specific determinations touching on the terms of individual trusts, the fees charged to those trusts, the bank's communications with individual donors or beneficiaries, and the specific tax-related services that BNY Mellon performed for individual trusts. While this argument may have some resonance with respect to predominance, discussed below, it does not speak to the typicality of the proposed class representatives' claims. The bank points to nothing in the record to explain why the plaintiffs' core theory -- that BNY Mellon charged trusts excessive tax-preparation fees without adequately disclosing them -- is not shared by both class representatives and the proposed class. See id. (noting that typicality is satisfied where plaintiff's "injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those of the class are based on the same legal theory").

The bank also argues that Henderson and Hershenson are subject to unique defenses, thereby defeating typicality. Specifically, it argues that both plaintiffs' claims are barred by the statute of limitations and laches, and that Hershenson's claim is also barred by the doctrine of ratification.

The bank has not pointed to any admissible evidence that it fully disclosed the now-complained-of tax markup to Dr.

14

Hershenson, nor that it made such a disclosure to any other
potential class member. Even if there were a full disclosure to
Dr. Hershenson, none was made to Ms. Henderson. The record as it
currently stands presents no concrete impediment to the Court's
conclusion that Henderson's and Hershenson's tax claims are
typical of those of the class. The Court finds this requirement
satisfied.

### 3.   Predominance

"The 'predominance inquiry tests whether proposed classes
are sufficiently cohesive to warrant adjudication by
representation.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct.
1036, 1045 (2016) (quoting Amchem Products, Inc. v. Windsor, 521
U.S. 591, 623 (1997)). The inquiry boils down to "whether the
common, aggregation-enabling, issues in the case are more
prevalent or important than the non-common, aggregation-
defeating, individual issues." Id. (quoting 2 W. Rubenstein,
Newberg on Class Actions § 4:49 (5th ed. 2012)). If so, a class
may be certified under Rule 23(b)(3) even though "other
important matters will have to be tried separately, such as
damages or some affirmative defenses peculiar to some individual
class members." Id. (quoting 7AA C. Wright, A. Miller, & M.
Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

BNY Mellon argues that the plaintiffs do not satisfy the
predominance requirement for three main reasons: (1) their

claims require individualized, trust-by-trust analyses; (2) those analyses will trigger burdensome choice of law problems; and (3) the plaintiffs have not proposed a viable class-wide damages model. On the whole, these issues do not pose insurmountable barriers to class certification.

First, the individual analyses that BNY Mellon predicts will not overtake the common issues already identified. The bank argues that it charged different trusts different amounts for tax services. However, as redefined below, the class will only include trusts that were charged the specifically identified line-item tax-preparation fee. The record shows that, during the line-item era, BNY Mellon generally imposed tax-preparation fees ranging from $400 to $950 per trust. That range of fees does not prevent the common questions identified above from predominating the case. Further, the line-item fees make the amount of the bank's charge readily ascertainable.

The bank also argues that its fee disclosures varied from trust to trust. But outside of the communications with Dr. Hershenson, discussed in more detail below, it identifies no such disclosures. It also argues that accountings from other courts may trigger issues of release and res judicata. This argument is underdeveloped. The bank does not provide concrete examples or data explaining how many trusts have had such an accounting, nor does it assert that such an accounting would

16

entail fulsome disclosure of the alleged markup challenged by the proposed class.

Second, the Court is not persuaded that the choice of law problems will be as extreme as the bank argues. BNY Mellon is correct that the "plaintiffs must shoulder the herculean burden of conducting an extensive review of state law variances to demonstrate how" the multi-state class will work. In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 94 (D. Mass. 2008). Here, the plaintiffs have identified 18 states where BNY Mellon has trust administration offices. According to the plaintiffs, those states have all adopted the Uniform Trust Code, the Restatement of Trusts, or substantially similar variants with respect to the duty of loyalty and duty to inform that they claim was breached by BNY Mellon. Similarly, they argue that all of the states employ a discovery rule that, under the facts alleged, tolls the statute of limitations so as to make these claims timely.

Based on the citations and excerpts provided, the Court agrees with the plaintiffs that the pertinent statutes are substantially similar on these key points. The bank mentions a handful of distinctions between the various states' laws -- for instance, that only some require disclosure of the "source" of a trustee's compensation, and that some may impose a different damages framework than others. But none of those differences go

17

to the heart of the plaintiffs' theory, which turns on fairly basic trust law principles.[4] Admittedly, the plaintiffs' 18-state sample may not encompass the full scope of the class, as certain trust instruments may invoke other states' laws. But the bank has not pointed to a single state statute that would even arguably permit the bank to charge the undisclosed tax-fee markup alleged in the complaint.

Third, the bank predicts that individual damages issues will preclude certification under Comcast Corp. v. Behrend, 569 U.S. 27, 34-35 (2013). The bank makes a fair point that measuring damages would be quite difficult under the bundled fee framework. Indeed, as explained below, the plaintiffs' inability to produce evidentiary support for their damages model in the bundled fee era is a major reason why the Court grants partial summary judgment to the bank for that piece of the claim.

However, those concerns dissipate when the class is narrowed to the trusts that paid line-item tax-preparation fees. A workable damages formula might look something like this:

(A)  For trusts that paid a line-item fee, documentary evidence will show the amount of that fee for each pertinent year.

---

[4]    The only arguably material difference identified by the bank was Ohio's discovery rule, which the bank claims does not apply to breach of fiduciary duty claims. The Court has a different understanding of the law. See Cundall v. U.S. Bank, 909 N.E.2d 1244, 1250 (Ohio 2009) (applying discovery rule analysis to beneficiaries' breach of fiduciary duty claim).

18

(B)   The bank's contract with PwC provides, if not an exact cost, at least a reasonable estimate of the per-trust value of PwC's services for each tax return.

(C)   As discussed below, one disputed factual issue for a jury will be how much tax-preparation work BNY Mellon retained for itself after contracting with PwC. Depending on what the jury finds, the jury can deduct the value of BNY Mellon's work.

Damages, therefore, would equal (A) minus (B) minus (C). Whether conducted in the aggregate or by using samples of individual trusts, such a formula could provide a reasonable estimate of damages on a class-wide basis. See Tyson, 136 S. Ct. at 1049 (observing that "the use of representative and statistical evidence in class actions . . . will depend on the purpose for which the sample is being introduced and on the underlying cause of action").

In sum, the Court finds that common questions of fact and law will predominate over the individual issues that BNY Mellon predicts. Therefore, the plaintiffs have satisfied predominance.

### 4.   Superiority

A Rule 23(b)(3) class should only be certified where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Such a class action is particularly superior where class treatment can vindicate the claims of "groups of people whose individual claims would be too small to warrant litigation." Smilow, 323 F.3d at 41; see also Deposit Guar.

Nat'l Bank v. Roper, 445 U.S. 326, 338 n. 9 (1980) (describing benefit to class members of "allocating [legal fees] among all members of the class who benefit from any recovery").

Given the large number of trusts and the relatively small amounts alleged to be in controversy for each individual trust, superiority is satisfied here. BNY Mellon has raised nothing to the contrary. Indeed, the bank does not actually contest this element apart from the predominance arguments discussed above. Accordingly, the Court finds that the proposed class is "superior to other available methods for fairly and efficiently adjudicating the controversy" under Rule 23(b)(3).

### 5. Adequacy

A Rule 23 class action may proceed only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The First Circuit has enunciated two elements to the adequacy requirement: (1) "that the interests of the representative party will not conflict with the interests of any of the class members," and (2) "that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

i.   Henderson's Adequacy

BNY Mellon has contested Henderson's adequacy as a class representative throughout these proceedings, citing mainly her relationship with her personal attorney, Brian McTigue. Notwithstanding those serious issues, in September 2017, the Court found Henderson to be an adequate class representative.

Since then, the relationship between Henderson, McTigue, and lead class counsel has continued to show signs of turbulence. In February 2018, the parties proposed a settlement of the case. Simultaneously, Henderson wrote a letter to the Court expressing her disapproval of the proposed settlement. However, class counsel later represented to the Court that Henderson had agreed to the settlement. The Court ultimately rejected the settlement for reasons similar to those that Henderson raised in her letter.

In June 2018, BNY Mellon renewed its challenge to the adequacy of Henderson and lead class counsel in a supplemental filing. In this document, the bank argued that Henderson refused to communicate with lead class counsel, would only communicate with McTigue, and had shifted positions on key issues such as the settlement. It also argued that lead class counsel attempted to involuntarily withdraw Henderson as a class representative in order to secure approval of the proposed settlement.

Finally, discord arose again at the summary judgment hearing, where class counsel and McTigue disagreed over whether, and to what extent, Henderson desired to press her imprudent investment claims in this case.

As a result of this series of unfortunate events, the Court held an ex parte lobby conference with Henderson in August 2018 with no lawyers present. One result of that conference was that Henderson agreed to communicate solely with lead class counsel and not with McTigue with respect to this case. The Court also inquired as to Henderson's understanding of the claims in this case and her desire to continue as class representative.

Given Henderson's representations to the Court, under oath, during that conference, the Court is satisfied -- despite some bumps in the road -- that Henderson and lead counsel will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Accordingly, she remains an adequate class representative.

### ii.  Hershenson's Adequacy

BNY Mellon argues that Hershenson is an inadequate class representative because his trust has terminated and he has resisted the natural winding-up process to remain a plaintiff in this case. But the termination of the Hershenson Trust is not germane to Hershenson's adequacy as a class representative. As explained more fully below, Hershenson's stake in the class

pertains only to the 2008 to 2010 time period, during which he
was charged a line-item tax-preparation fee. That alleged harm
is similar to what the other members of the proposed class claim
to have suffered, albeit for potentially a shorter time period.
In any event, the Court finds no necessary conflict between
Hershenson's interest in winding up his trust and the class's
interest in pursuing the tax markup claim. BNY Mellon points to
no other reason to question Hershsenson's adequacy, and the
Court sees none.

### C.   Summary

For the reasons given, the Court finds that the proposed
class, as modified below, satisfies the requirements of Rule 23.
Accordingly, the plaintiffs' motion for class certification is
**ALLOWED IN PART** and **DENIED IN PART**.

## II.   Summary Judgment

### A.   Legal Standards

#### 1.   *Summary Judgment*

Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). "[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphases in original).
An issue is genuine "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party." Id. at
248. A fact is material if it "might affect the outcome of the
suit under the governing law." Id.

     2.   *Fiduciary Duties*

     As mentioned above, the plaintiffs seek to certify a multi-
state class. Thus, the class claims will turn on specific state
statutes governing trust law. However, the plaintiffs rely on
two basic fiduciary duty standards that, at core, appear to be
common across the class.

     First, they invoke the duty of loyalty, which generally
requires a trustee "to administer the trust solely in the
interest of the beneficiaries" and avoid "engaging in
transactions that involve self-dealing." Restatement (Third) of
Trusts § 78 (2007). It also entails "a duty in dealing with a
beneficiary to deal fairly and to communicate to the beneficiary
all material facts the trustee knows or should know in
connection with the matter." Id.

     Second, they invoke the duty of candor. As relevant here,
this duty requires the trustee to promptly inform beneficiaries
"of basic information concerning the trusteeship." Id. § 82. It
also requires a trustee to keep beneficiaries "reasonably
informed . . . about . . . significant developments concerning

24

the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests." Id.

### B.   Analysis

Each side seeks summary judgment on the tax markup claims. The plaintiffs argue that BNY Mellon's own documents conclusively establish that BNY Mellon outsources all of its tax-preparation work to PwC and pays PwC a per-trust cost for that work. According to the plaintiffs, BNY Mellon passes on that cost to each trust, plus a profit margin of hundreds of dollars per trust every year, and fails to disclose this markup to its customers. The plaintiffs claim this results in a breach of the bank's fiduciary duties of loyalty and candor, and requires summary judgment in the plaintiffs' favor.

The bank counters that the plaintiffs' claim is based on two demonstrably false premises: (1) that BNY Mellon outsourced "all" tax-preparation work to PwC, and (2) that BNY Mellon "marked up" what PwC charged in order to earn a profit. Further, the bank argues that it disclosed the tax-preparation fees in question to customers, which entitles it to summary judgment on the affirmative defenses of statute of limitations, ratification and acquiescence, and laches.

### 1.   Outsourcing of Tax Work

The record contains conflicting evidence on whether, and to what extent, BNY Mellon retained tax-preparation work after it entered into the contract with PwC. The plaintiffs point to contract language and other internal documents from BNY Mellon indicating that it had completely outsourced tax-preparation services to PwC. But, as the bank points out, these contracts also reserve certain functions for BNY Mellon. The record also contains evidence that BNY Mellon, even after the outsourcing, maintains a 20-person tax department. And there is evidence that members of this department perform a variety of tax-related work, ranging from "setting internal BNY Mellon tax policy" to reviewing PwC's work to reconciling its own accounting systems with PwC's records. Given the conflicting evidence, this issue is not appropriate for summary judgment.

### 2.   Markup

The question of whether BNY Mellon imposed a markup for tax-related services is best addressed by splitting the types of tax-preparation fees into two groups: the line-item fees and the bundled fees (which include the fiduciary fee, service fee, and advisory fee).

### i.   <u>Line-Item Fees</u>

For the line-item group, conflicting evidence precludes the entry of summary judgment in favor of either party. To

illustrate, language from the BNY Mellon-PwC contract from 2008
to 2012 would permit a rational fact-finder to conclude that the
bank paid PwC a "per account" price of $90 for grantor tax
returns, $176 for simple tax returns, and $197 for complex tax
returns. (The subsequent contract contains slightly higher
figures of $94, $183, and $205, respectively, for 2013 forward.)
Yet, the parties agree that BNY Mellon generally charged trust
customers tax-preparation fees of $400 for grantor trusts, $750
for revocable trusts, and between $750 and $950 for irrevocable
trusts, depending on complexity. A reasonable fact-finder could
readily conclude that the delta between the line-item fee and
the payment to PwC includes an illegal and undisclosed profit
for the bank.

On the other hand, BNY Mellon points to deposition
testimony from its own personnel and PwC officials indicating
that their contract was driven by a total aggregate fee based on
anticipated volume, and that the per-account figures just
mentioned were calculated after the fact to facilitate a year-
end reconciliation between the parties. Moreover, even if it is
assumed that the line-item fee included some markup, a
reasonable fact-finder could still conclude that BNY Mellon
retained enough tax-related work beyond the scope of PwC's
contract that whatever margin existed between the line-item fee
and the PwC charge was reasonable compensation for the trustee's

27

additional work. Either, or both, of these conclusions could be supported by admissible evidence in the summary judgment record and would lead to the colorable conclusion that the bank did not impose an illegal markup via the line-item tax-preparation fee. Therefore, summary judgment is not appropriate for either party.

### ii.  Bundled Fees

For the bundled-fee group, the Court must enter summary judgment in the bank's favor. As the "bundled fee" moniker suggests, fees like the "fiduciary fee" and "advisory fee" are intended to compensate the bank for a wide variety of services, including tax-related work. BNY Mellon argues that these fee structures make it impossible to determine what portion of the bundled fee pertains to taxes, as opposed to other services, and therefore the plaintiffs have failed to adduce any evidence of a markup. This lack of evidence, the bank argues, means the plaintiffs cannot prove liability or damages, and must lose at summary judgment.

The plaintiffs' response rests on the report of their proffered expert, Clifford Kupperberg. Kupperberg asserts that when BNY Mellon switched customers from the line-item fee to the bundled fee, the new fee imposed a higher minimum charge -- $3,500 instead of $2,500. According to Kupperberg, this $1,000 increase roughly corresponds to the former tax-preparation fee; as a result, BNY Mellon's overall intake from tax-related fees

28

remained constant or rose. In other words, based on this expert
testimony, the plaintiffs argue that the fact-finder may
reasonably infer that the bundled fee simply rolled over the
prior line-item fee (and its alleged markup) into a new, less-
transparent format.

But the plaintiffs have not produced any evidentiary basis
for the inference that Kupperberg proposes. Indeed, at the
hearing, the plaintiffs' counsel acknowledged as much and
referred to Kupperberg's calculations as "fuzzy math." "This
sort of purely conjectural assumption, drawn from an empty
record, is insufficient to propel a cause of action beyond the
summary judgment stage." Gomez v. Stop & Shop Supermarket Co.,
670 F.3d 395, 398 (1st Cir. 2012).

Here, the plaintiffs pivot to a fallback argument: that BNY
Mellon breached its fiduciary duties by employing such an opaque
fee structure that even the bank does not know what it is
charging for tax preparation. That is, the very fact that it may
now be impossible to tell whether BNY Mellon overcharged for
tax-related services proves that it breached its fiduciary
duties of candor and record-keeping. But if the plaintiffs
prevailed on such a theory, the lack of reliable evidence to
support a damages calculation would remain a stumbling block,
particularly in light of the lack of expert evidence that the
bundled fee is otherwise excessive, say, in light of industry

practice. See Comcast, 569 U.S. at 35 (noting importance of method for measuring damages at class-certification stage).

Accordingly, the Court allows the bank's motion for summary judgment with respect to the bundled fees. This has the effect of narrowing the plaintiffs' proposed class to only those trusts that paid a line-item fee during the relevant years.

### 3.   *Disclosure and Affirmative Defenses*

Lastly, the Court turns to the bank's affirmative defenses of statute of limitations, ratification and acquiescence, and laches. These pertain solely to the proposed class representatives' individual claims, primarily Hershenson's.

### i.   Statute of Limitations

BNY Mellon argues that both proposed representatives' claims are barred by the statute of limitations based on the bank's disclosure of the challenged tax fees to Hershenson in 2010 and Henderson in 2012. Because the plaintiffs' tax theory was not asserted until the First Amended Complaint in March 2016, the bank argues it is time-barred.

In both relevant states (Pennsylvania for the Hershenson Trust, Massachusetts for the Wesson Trust), the discovery rule may toll the statute of limitations for breach of fiduciary duty claims. See United States v. Rose, 346 F.2d 985, 989-90 (3d Cir. 1965) (applying Pennsylvania law) ("The statute of limitations begins to run against the trust beneficiary with respect to a

suit against the express trustee, if at all, when he knows the trust has been repudiated or reasonably should have known it."); Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 130 (1st Cir. 1987) (applying Massachusetts law) (equating Massachusetts discovery rule with federal "reasonable diligence" standard and applying this standard to breach of fiduciary duty claim).

The disclosures upon which the bank relies were not sufficient, as a matter of law, to put either plaintiff on actual or constructive notice of the tax-preparation fee claim they now assert. With respect to the Hershenson Trust, the bank focuses its argument on Dr. Hershenson's 2010 meeting with a BNY Mellon wealth manager. But the bank has not adduced any specific information about this meeting that reasonably would have put Dr. Hershenson on notice of the tax-preparation fee claim. The wealth manager's declaration and notes describe, only in general terms, that she met with Dr. Hershenson "to discuss the [tax-preparation] fees" and that after changing his fee structure, Dr. Hershenson seemed "pleased" with the new structure. With respect to Henderson, the bank points to a 2012 account statement that lists, among several pages of other transactions, two line items for a "2011 Tax Prep Fee," next to negative charges of $525 and $225.

Without more, these disclosures were not sufficient to put a reasonable person on actual or constructive notice of the tax-

preparation markup. In other words, a rational fact-finder could readily conclude that neither plaintiff knew or reasonably should have known that the tax-preparation fee included the markup now complained of. Accordingly, the Court denies BNY Mellon's motion for summary judgment on statute of limitations grounds.

### ii.   Ratification and Acquiescence

BNY Mellon next argues that because Dr. Hershenson was aware of the tax fee and then negotiated a new bundled fee, he ratified and acquiesced in the new fee -- an argument that, according to the bank, imputes to the son Hershenson as well. This is a moot point given the Court's ruling above, which eliminates bundled fees from the class definition. The Hershenson Trust is not part of this case after its fee structure changed from a line-item fee to a bundled fee. And the bank makes no assertion that Dr. Hershenson ratified or acquiesced in the line-item fee. Thus, the bank's motion is denied on this issue.[5]

---

[5]      Even if the Court were to reach the merits, the bank would lose. In Pennsylvania, ratification or acquiescence turns on whether the beneficiary "consented to the conduct constituting the breach." 20 Pa. Stat. and Cons. Stat. § 7789. To trigger this rule, "the beneficiary must know of the beneficiary's rights and of the material facts relating to the breach." Id. (Uniform Law Comment). As discussed in the statute of limitations section, the bank has failed to produce evidence of such knowledge on the part of Dr. Hershenson.

iii. <u>Laches</u>

Finally, BNY Mellon argues that Hershenson's claim is barred by laches because his failure to exercise due diligence has cased prejudicial delay to the bank. Specifically, the bank argues that it is prejudiced because Dr. Hershenson is dead, and the pre-2010 manager for the Hershenson Trust has retired and lives outside the Court's subpoena power.

In Pennsylvania, "[l]aches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another." <u>Sprague v. Casey</u>, 550 A.2d 184, 187 (Pa. 1988). "Thus, in order to prevail on an assertion of laches, respondents must establish: [1] a delay arising from petitioner's failure to exercise due diligence; and, [2] prejudice to the respondents resulting from the delay." <u>Id.</u> (numerals added).

The bank has a fair point on prejudice in light of Dr. Hershenson's death. For example, the discovery rule analysis above would be aided by testimony from Dr. Hershenson regarding what he learned about the tax fees from his BNY Mellon wealth manager. But this very shortcoming defeats the bank's argument on the due-diligence prong. That is, the bank has not produced conclusive evidence that Dr. Hershenson knew about the tax markup and failed to act on it. Moreover, the bank could take the deposition of its former manager. At the very least, under a

33

summary judgment standard, a rational fact-finder could determine that Dr. Hershenson did not and could not reasonably know about the markup, and thus did not lack due diligence by not bringing this claim sooner. Accordingly, it would be inappropriate to allow summary judgment for the bank on this equitable defense.

## ORDER

The Court **ALLOWS IN PART** and **DENIES IN PART** the plaintiffs' motion for class certification (Dkt. No. 285). The Court certifies the following class:

> The Unlawful Fees Class: From 2008 to the present, all personal trusts for which: (1) BNY Mellon served or serves as trustee; (2) BNY Mellon charged line-item tax-preparation fees amounting to at least $400 per year for grantor trusts, at least $750 per year for revocable and "simple" irrevocable trusts, or at least $950 per year for "complex" irrevocable trusts for one or more of the covered years; and (3) the paid preparer of the fiduciary return covered by the line-item tax-preparation fee was PricewaterhouseCoopers.

BNY Mellon's motion for summary judgment (Dkt. No. 315) is **ALLOWED IN PART** and **DENIED IN PART**. The plaintiffs' motion for partial summary judgment (Dkt. No. 365) is **DENIED**.


/s/ PATTI B. SARIS_____
Patti B. Saris
Chief United States District Judge